IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 22, 2000

## STATE OF TENNESSEE v. JIMMY WAYNE BAKER

**Direct Appeal from the Circuit Court for Bedford County**
**No. 14303, 14416      Charles Lee, Judge**

_____

### No. M1999-00454-CCA-R3-CD - Filed March 14, 2001

_____

The Defendant, Jimmy Wayne Baker, was convicted by a Bedford County jury of first degree felony murder during the perpetration of or the attempt to perpetrate theft of property, first degree premeditated murder, and aggravated arson. The trial court merged the felony murder conviction with the premeditated murder conviction. The Defendant was sentenced as a Range I standard offender to life imprisonment for the first degree murder conviction and to twenty-one years and nine months incarceration for the aggravated arson conviction, to be served concurrently. The Defendant now appeals, arguing the following: (1) that the trial court erred in instructing the jury to determine whether one of the witnesses was an accomplice; (2) that the evidence presented at trial was insufficient to convict the Defendant of premeditated murder, felony murder, or aggravated arson; (3) that the trial court erred in failing to instruct the jury that they must agree unanimously on a particular set of facts to support a finding of first degree felony murder; (4) that his convictions of both premeditated murder and felony murder violated the Double Jeopardy Clause and the Supremacy Clause; (5) that the Defendant was not properly informed of the elements of and facts necessary to constitute the offense of theft of property as the underlying felony in the felony murder conviction; (6) that the Defendant's sentence for aggravated arson was excessive; and (7) that the trial court erred in failing to instruct the jury on all elements of the offenses charged. After review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

John E. Herbison, Nashville, Tennessee, for the appellant, Jimmy Wayne Baker.

Paul G. Summers, Attorney General and Reporter; Lucian D. Geise, Assistant Attorney General; William Michael McCown, District Attorney General; Robert G. Crigler, Assistant District Attorney General; and Ann L. Filer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant, Jimmy Wayne Baker, was convicted by a Bedford County jury of murder in perpetration of theft or attempted theft of property, premeditated murder, and aggravated arson. The two counts of first degree murder were merged into one conviction for which the Defendant received a life sentence. The trial court sentenced the Defendant to twenty-one years and nine months incarceration for the aggravated arson conviction and ordered that it be served concurrently with the life sentence for the murder conviction. On appeal to this Court, defense counsel filed an Anders brief alleging that the appeal was frivolous. See Anders v. California, 386 U.S. 738 (1967); State v. Ingram, 994 S.W.2d 626 (Tenn. Crim. App. 1998). However, defense counsel presented the following arguments in his brief: (1) that the Defendant's sentence for aggravated arson was excessive, and (2) that the trial court erred in instructing the jury to determine whether or not Patrick Wingate was an accomplice. This Court allowed the Defendant to review the record and raise additional issues. As such, the Defendant filed a pro se brief arguing the following: (1) that the evidence presented at trial was insufficient to convict the Defendant of premeditated murder, felony murder, or aggravated arson (the Defendant's issues three, four and five); (2) that the trial court erred in instructing the jury to determine whether or not Patrick Wingate was an accomplice (the Defendant's issue eight); (3) that the trial court erred in failing to instruct the jury that they must agree unanimously on a particular set of facts to support a finding of first-degree felony murder (the Defendant's issue six); (4) that the convictions for both premeditated murder and felony murder violated the Double Jeopardy Clause and that the "merger rule" as announced by this Court violates the supremacy clause (the Defendant's issue one); (5) that the Defendant was not properly informed of the elements and facts necessary to constitute the offense of theft of property as the underlying felony in the felony murder conviction (the Defendant's issue two); and (6) that the trial court erred in failing to instruct the jury on all elements of the offenses charged (the Defendant's issue seven). Having reviewed the record, we affirm the judgment of the trial court.

**I. FACTUAL BACKGROUND**

Viewing the facts in the light most favorable to the State, the following events took place in Bedford County on December 15, 1997. On that morning, the Defendant picked up Patrick Wingate and drove to Steven Pugh's residence on Warner's Bridge Road. Pugh and Jeff Gibbs were at Pugh's trailer when the Defendant and Wingate arrived. The Defendant, Wingate and Gibbs were all employed by Pugh as general laborers. That morning, the four men went to Wheel to salvage some items from Pugh's former residence that had burned down. After loading some items in Pugh's truck, the men drove back to Pugh's Warner's Bridge Road residence and unloaded the items near a shop building behind Pugh's trailer. Gibbs testified that the men got back to Pugh's house around ten o'clock in the morning.

That afternoon, the Defendant, Wingate and Pugh left again to get some gravel. Gibbs remained at the trailer. Gibbs testified that the three men came back to Pugh's residence around 2:30 that afternoon without the gravel. Pugh's neighbor, John Gold, also testified that he saw the Defendant, Pugh and Wingate pull into Pugh's driveway at approximately 2:30 in the afternoon. The

Defendant was driving Pugh's truck. Wingate was sitting on the passenger side and Pugh was sitting between them. Gold testified that the Defendant parked Pugh's truck in front of Pugh's shop, and all three men went into the shop. Gold further testified that he later saw smoke coming from the shop door and that the Defendant's car was gone at that time.

Gibbs testified that sometime that afternoon while he was stacking wood outside the shop, he "heard something hit the floor real hard" inside the shop. At the time, the Defendant, Wingate and Pugh were all in the shop. The Defendant came outside and told Gibbs that Pugh was drunk and had fallen off the bar stool. The Defendant told Gibbs to go to the trailer and get a faucet. The Defendant then went back into the shop.

Unable to locate the faucet, Gibbs went back to the shop, where he saw the Defendant standing in front of the door. The Defendant told Gibbs that he should go back to the trailer. Gibbs went to the trailer, and a few minutes later Wingate came to the trailer and told Gibbs that they should leave. At that time, the Defendant, Wingate and Gibbs all left Pugh's residence.

Regarding what happened inside the shop, Wingate testified that he was stacking some kindling inside the shop when he heard a thud behind him. He turned around to find Pugh lying on the floor. Wingate testified that he and the Defendant helped Pugh back onto the stool that he had been sitting on, and Wingate resumed stacking the wood. Wingate testified that he heard another thud, and he turned around to find Pugh on the floor again. Wingate testified that the Defendant was standing over Pugh with a stick in his hand. He further testified that he saw the Defendant hit Pugh three or four times in the head. The Defendant told Wingate to make sure that nobody came to the door. Wingate was watching the door when he felt the Defendant's hand on his shoulder, and the Defendant said, "It's time for us to go." Wingate testified that before leaving, he saw Pugh's body on the floor of the shop with a piece of burning cardboard in front of the body.

The Defendant's account of the events that took place in the shop differs from that of Wingate. The Defendant testified that he was about to leave the shop to get beer when he heard Pugh fall. The Defendant said that he and Wingate put Pugh back on the stool, and he went outside. The Defendant testified that when he came back to the shop, Wingate met him at the door, and they left. According to the Defendant, Wingate told him that he (Wingate) hit Pugh in the head.

Jeff Gibbs testified that he, the Defendant and Wingate left Pugh's residence. They stopped at a bank and a liquor store and then went to the Defendant's house. Gibbs testified that the Defendant bought Gibbs some whiskey at the liquor store. Paralee Williams, the owner of the liquor store, testified that the Defendant smelled like smoke when he came in the store. Gibbs testified that when they arrived at the Defendant's home, the Defendant's wife informed the three men that Pugh was dead. Gibbs testified that the Defendant and Wingate began crying. The three men then drove to the sheriff's department, and Gibbs testified that on the way, the Defendant told him to "keep on saying that [Pugh] fell off of a bar stool and hit his head." Wingate testified that the Defendant turned up the radio and advised him that it would be in Wingate's best interest not to say anything about what had happened.

Wanda Shirley, Pugh's girlfriend, arrived at the home that she shared with Pugh at about three o'clock and saw smoke coming out of the shop. Shirley called 911. Shirley testified that Pugh's truck was parked up against the large door of the shop which was very unusual.

Matt Doak, a firefighter, testified that Pugh's body and the floor immediately surrounding Pugh's body were on fire when he arrived. Detective David Adams of the Bedford County Sheriff's Department testified that only the floor around Pugh's body was burned. He also testified that burned checks, keys and a broom were found near the body.

Dr. Charles Harlan, the consulting forensic pathologist for Bedford County, performed the autopsy on Pugh. Harlan testified that Pugh died from blunt trauma to the head. Pugh had at least four different lacerations on his head, which Harlan testified were caused by a rapid succession of blows to the head. Harlan testified that all four of the lacerations went through to the bone and that the skull was fractured under three of the wounds. According to Harlan's testimony, a linear, firm object, such as a baseball bat, broom handle, pool cue or lead pipe, probably caused the head injuries. Harlan testified that Pugh also had fourth-degree burns over eighty percent of his body. Harlan testified that Pugh was alive when he was on fire.

Evidence was presented at trial to prove that in the days following the fire, the Defendant and Wingate tried to pass checks from Pugh's bank account. The Defendant testified that he saw Wingate take two of Pugh's checkbooks and trace Pugh's name on the checks. The Defendant then presented one of those checks in the amount of $2,500 for payment at a local bank. Evidence was also presented at trial that Wingate and the Defendant went to a car dealership where Wingate attempted to pass a two-party check from Pugh's account to buy a van. That check was in the Defendant's possession when he was arrested.

Diana Harrison, a document examiner with the Federal Bureau of Investigation (FBI), examined the checks that were cashed by the Defendant. Although she determined that the signatures had been simulated or traced, Harrison was unable to render an opinion as to who signed the documents. However, all of the checks that had simulated signatures were made out to the Defendant or Wingate. The checks made out to the Defendant on Pugh's account totaled $7,100.

Steve Elliot, Captain of Detectives for the Bedford County Sheriff's Department, interviewed the Defendant after his arrest. Elliot testified that the Defendant admitted to being at the shop on that afternoon. According to Elliot, the Defendant said that Pugh fell off of a bar stool and hit his head. The Defendant told Elliot that he and Wingate helped Pugh back onto the stool and that the Defendant then left.

After his arrest, the Defendant took the police to Anthony Road where they found checks that had been burned. Pugh's name was on the checks. The Defendant also took the police to his home on Lakewood Drive to find a pair of burned jeans and a burned checkbook.

-4-

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant argues that there was insufficient evidence to convict him of first degree premeditated murder, first degree felony murder or aggravated arson. We disagree.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990) overruled on other grounds, State v. Hooper, 29 S.W.3d 1 (Tenn. 2000).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956); State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

### 1. Premeditated Murder

Sufficient evidence was presented at trial to convict the Defendant of first degree premeditated murder. First degree premeditated murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine

whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. 1999) (citing Brown, 836 S.W.2d at 539)). The use of a deadly weapon upon an unarmed victim may support the existence of premeditation. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

Viewing the evidence in the light most favorable to the State, a jury could have reasonably found that the Defendant killed Steven Pugh after the exercise of reflection and judgment. Wingate testified that he saw the Defendant hit Pugh three or four times on the head with a stick. According to Wingate, the Defendant then told Wingate to make sure that nobody came to the door.

In addition to Wingate's testimony, Jeff Gibbs testified that he was outside the shop stacking wood when he heard a "thud" inside. The Defendant came outside and told Gibbs that Pugh was drunk and had fallen off a bar stool. The Defendant then told Gibbs to go to the trailer to look for a faucet. Unable to find the faucet, Gibbs went back to the shop. The Defendant, who was nervously shaking his arm, told Gibbs to go back to the trailer. Gibbs also testified that the Defendant told him repeatedly that he should tell the authorities that Pugh had fallen off a stool and hit his head.

## 2. Felony Murder

Sufficient evidence was presented at trial to convict the Defendant of felony murder committed during the perpetration or the attempted perpetration of a theft. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2). In this case, the Defendant was charged with felony murder during the perpetration of or attempt to perpetrate theft of property over $500.

Evidence was presented at trial that the Defendant, along with Patrick Wingate, tried to pass checks from Pugh's account within several days after Pugh's death. The Defendant testified that he saw Wingate take two of Pugh's checkbooks and trace Pugh's name on the checks. This is corroborated by testimony from an FBI expert that four checks made payable to the Defendant from Pugh's account were signed with simulated signatures. The Defendant then presented one of those checks in the amount of $2,500 for payment at a local bank. Evidence was also presented at trial that Wingate and the Defendant went to a car dealership, and Wingate attempted to pass a two-party check from Pugh's account to buy a van. That check was in the Defendant's possession when he was arrested. Thus, there was ample evidence from which a jury could determine that the Defendant had committed murder in the perpetration of or attempt to perpetrate a theft of property valued at more than $500.

### 3. Aggravated Arson

Sufficient evidence was presented at trial to convict the Defendant of aggravated arson. An offender commits arson by knowingly damaging any structure by means of a fire or explosion with the intent to destroy or damage the structure for any unlawful purpose. Id. at § 39-14-301. A person commits aggravated arson who commits arson as defined in Tennessee Code Annotated § 39-14-301 when one or more persons are present therein. Id. § 39-14-302.

In this case, there is ample evidence from which a jury could conclude that the Defendant set fire to Pugh's shop while Pugh was still inside. Wingate testified that when he and the Defendant left the shop, there was a piece of cardboard burning in front of Pugh's body. The owner of a liquor store where the Defendant stopped on the way from Pugh's residence testified that the Defendant smelled like smoke.

### B. Jury Instructions

### 1. Accomplice Testimony

The Defendant argues that the trial court erred by instructing the jury to determine whether Wingate was an accomplice, rather than instructing the jury that Wingate was an accomplice as a matter of law. An accomplice is one who "knowingly, voluntarily and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). "When the facts of a witness' participation in a crime are clear and undisputed it is a question of law for the court to decide." State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). In this case, the Defendant argues and the State concedes that the trial court should have declared Wingate to be an accomplice as a matter of law.

This determination is important because in Tennessee a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, corroborating evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the Defendant with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

We note initially that this issue has been waived because the Defendant failed to timely file a motion for a new trial within thirty days of the day his sentences were entered. Tenn. R. App. P. 3(e). "Questions concerning the instructions are generally deemed to be waived in the absence of objection or special request, unless they contain plain error." State v. Cravens, 764 S.W.2d 754, 757 (Tenn. 1989). A jury instruction constitutes plain error where it affects the substantial rights of the accused. Tenn. R. Crim. P. 52(b). We conclude that there was no plain error in the jury instruction in this case.

Wingate had previously been convicted for charges based upon the same facts. Therefore, we conclude in this case that the trial court should have instructed the jury that Wingate was an accomplice as a matter of law. However, we hold that such error was harmless. We conclude that ample evidence was presented to the jury to corroborate Wingate's testimony. Jeff Gibbs testified that while he was outside the shop, he heard something hit the floor inside. Immediately thereafter, the Defendant came outside and told Gibbs that Pugh had fallen off of a stool. Gibbs testified that the Defendant told him to go to the trailer. When Gibbs returned, the Defendant was standing outside the shop shaking his arm nervously. The Defendant told Gibbs to go back to the trailer. Moments later, Wingate went to the trailer and told Gibbs it was time to go. Gibbs also testified that on the ride to sheriff's office, the Defendant told Gibbs to "keep on saying that [Pugh] fell off of a bar stool and hit his head."

In addition to Gibbs testimony, the Defendant's own testimony corroborates Wingate's accomplice testimony to some extent. The Defendant's testimony places the Defendant at the scene of the crime at the time the crime was committed. Pugh's neighbor, John Gold, testified that he saw the Defendant, Pugh and Wingate drive up to the shop that afternoon. Soon thereafter, Gold testified that he saw smoke coming from the shop, and the truck was gone. Moreover, there was testimony from firefighters that Pugh's body was on fire when they arrived at the shop just a short time after the Defendant left. The owner of the liquor store where the Defendant stopped after leaving Pugh's residence on the day of his death testified that the Defendant smelled like smoke when he came in. Also, bank employees testified that in the days following Pugh's death, the Defendant cashed checks on Pugh's account. Although the trial court erred by failing to instruct the jury that Wingate was an accomplice as a matter of law, the error was harmless because sufficient corroborating evidence was presented to the jury.

## 2. Felony Murder Instruction

The Defendant next argues that the trial court erred in failing to instruct the jury that they must agree unanimously on a particular set of facts to support a finding of first degree felony murder. Specifically, the Defendant argues that the trial court failed to instruct the jury that it had to agree unanimously as to whether the alleged killing was committed during the act of perpetrating theft or the act of attempting to perpetrate theft.

In this case, the Defendant was convicted of felony murder in the perpetration of or the attempt to perpetrate theft over $500. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2). The trial court instructed the jury that its verdict must be unanimous, and the jury did in fact vote unanimously to convict the Defendant of felony murder. In the case of felony murder, there is no legal requirement that a jury verdict specify whether the killing was committed during the actual perpetration of the felony or during an attempt to perpetrate the felony. See id. Thus, the Defendant's argument is without merit. Additionally, our review of the trial court's jury instructions

reveals that the trial court properly instructed the jury as to each element of each offense charged, from which we conclude that the Defendant's pro se issue number seven is without merit.

## C. Sentencing

The Defendant argues that his sentence for aggravated arson was excessive. Specifically, the Defendant argues that the trial court erred in starting at the midpoint of the sentencing range and then adjusting the sentence up for enhancement factors and down for mitigating factors. The Defendant argues that the trial court should have begun with the minimum sentence. We conclude that the trial court properly sentenced the Defendant.

The Defendant was sentenced as a Range I standard offender to twenty-one years and nine months for aggravated arson. Aggravated arson is a Class A felony. This sentence was to be served concurrently with the Defendant's life sentence for the murder of Steven Pugh. In sentencing the Defendant, the trial court applied the following enhancement factors: (1) "[t]he [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," id. § 40-35-114(1), and (5)" [t]he [D]efendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Id. § 40-35-114(5). The only mitigating factor that the trial court applied was that the Defendant assisted authorities in detecting or apprehending Wingate. Id. § 40-35-113(9).

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Id. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

The presumptive sentence for a Class A felony is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Id. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). This Court has held that this presumptive sentence also applies where there are enhancement and mitigating factors. See State v. Hodges, 7 S.W.3d 609, 631 (Tenn. Crim. App. 1998); State v. Chance, 952 S.W.2d 848, 850-51 (Tenn. Crim. App. 1997). The weight to be given each factor is left to the discretion of the trial judge. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the

factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

In this case, the trial court followed the proper statutory sentencing procedure by starting at the midpoint of the range in sentencing the Defendant. The presumptive sentence for aggravated arson is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Although the Defendant interprets the statute to mean that this presumptive sentence only applies where there are no enhancement or mitigating factors, this Court has held that this presumptive sentence also applies where there are enhancement and mitigating factors. Hodges, 7 S.W.3d at 631; Chance, 952 S.W.2d at 850-51. As such, the trial court properly started at the midpoint of the sentencing range and increased the sentence for the enhancement factors and reduced the sentence for the mitigating factor.

### D. Double Jeopardy and Supremacy Clause

The Defendant argues that his convictions for premeditated murder and felony murder violated the Double Jeopardy Clauses of the United States and Tennessee Constitutions. Both clauses state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. 5; Tenn. Const. art. I, § 10. In addition to protecting against a second prosecution for the same offense where the defendant was either convicted or acquitted, this clause has also been interpreted to protect against multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds, Alabama v. Smith, 490 U.S. 794 (1989); State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996).

In this case, the Defendant was found guilty of both felony murder and premeditated murder for the same offense. However, the two verdicts were merged under one conviction. Thus, the Defendant was subject to only one sentence of life imprisonment. No double jeopardy problem exists where "the trial court's entry of only one judgment of conviction imposing only one sentence of life imprisonment protects the defendant from receiving multiple punishments for the same offense." State v. David Eric Price, No. E1999-02684-CCA-R3-C, 2000 WL 1015914, at *31 (Tenn. Crim. App., Knoxville, July 25, 2000); State v. Addison, 973 S.W.2d 260, 266-67 (Tenn. Crim. App. 1997); State v. Zirkle, 910 S.W.2d 874, 889 (Tenn. Crim. App. 1995).

The Defendant also argues that the trial court's merging of the two murder convictions into one conviction violates the Supremacy Clause of the United States Constitution. The Supremacy Clause states that the United States Constitution and the laws made in pursuance thereof shall be the supreme law of the land. U.S. Const. amend. 6, clause 2. The Defendant argues that the merger rule is in conflict with the Double Jeopardy Clause, and that the Double Jeopardy Clause should trump the merger rule by virtue of the Supremacy Clause. As we have concluded that there is no peril of double jeopardy in this case, there is no conflict with the Supremacy Clause. We conclude that the

-10-

merger rule is in fact not in conflict with the Double Jeopardy Clause, but rather is a means of avoiding any Double Jeopardy issues. This issue is without merit.

## E. Sufficiency of the Indictment

The Defendant argues that he was not properly informed of the elements and facts necessary to constitute the offense of theft of property sufficient to support a conviction for murder during the perpetration of theft of property. Specifically, the Defendant argues that the indictment failed to include the factual allegations of the underlying felony. Both the United States and Tennessee Constitutions require that an accused be sufficiently informed of the "nature and cause of the accusation." U.S. Const. amend 6, 14; Tenn. Const. art. I, § 10; see also State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). These provisions have been interpreted to require that an indictment:

> (1) provide notice to the accused of the offense charged; (2) provide the court with an adequate ground upon which a proper judgment may be entered; and (3) provide the defendant with protection against double jeopardy.

Wyatt v. State, 24 S.W.3d 319, 324 (Tenn. 2000); see also Hill, 954 S.W.2d at 727; State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991).

The Tennessee Code Annotated further requires that an indictment
> state the facts constituting the offense in an ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Tenn. Code Ann. § 40-13-202.

In this case, the indictment read as follows:
> THE GRAND JURORS of BEDFORD County, Tennessee, duly impaneled and sworn, upon their oath, present that:
>
> JIMMY WAYNE BAKER
>
> on or about the 15th DAY OF DECEMBER, 1997, in BEDFORD County, Tennessee and before the finding of this indictment, intentionally, knowingly and recklessly did kill STEVEN GILBERT PUGH, during the perpetration of or attempt to perpetrate a crime THEFT OF PROPERTY OVER $500, in violation of Tennessee Code Annotated § 39-13-202, and against the peace and dignity of the State of Tennessee.

We conclude that the indictment sufficiently set forth the elements and factual basis for the charges against the Defendant. The indictment specifically referred to the date of the offense, the name of the victim, and the crime theft of property. Again, this issue is without merit.

Accordingly, the judgment of the trial court is AFFIRMED.


_____
ROBERT W. WEDEMEYER, JUDGE